Philip PETRUS et al v. ARKANSAS IRRIGATION
Company

73-60                                    499 S.W. 2d 60

Opinion delivered September 24, 1973

*Macom, Moorhead & Green,* and *Chas. A. Walls Jr.,*
for appellants.

*John D. Thweatt* and *James M. Thweatt,* for appel-
lee.

George Rose Smith, Justice. For some 30 years the
plaintiff-appellee, Arkansas Irrigation Company, has
maintained a 6,000 acre reservoir in Prairie county, known
as Peckerwood Lake. The company uses water from the
reservoir in its own farming operations and sells water
to neighboring rice farmers. The company does not own

the entire bed of the lake in fee simple, but it does have flowage rights upon lands lying below 207 feet mean sea level.

The appellants, Philip and Joseph Petrus, are brothers whose farm lands are partly subject to the irrigation company's flowage easements. In the fall of 1961 the Petrus brothers constructed levees to enclose about 20 acres of their land that was subject to the appellee's flowage rights. The Petruses also installed a pump with an intake below the 207-foot line, enabling them to withdraw water from the reservoir. Whether the Petruses had a valid contract authorizing them to enclose the 20 acres and install the pump is the principal question in this case.

In 1964, the appellee brought this suit to require the Petrus brothers to remove the levees and the pump, to recover compensation for the Petruses' use of the land within the levees for the growing of crops, and to recover compensation for water pumped by the Petruses from the reservoir. The taking of testimony was not completed until 1969; the Petruses' attorney, J. B. Reed, died after the case had been submitted to the chancellor for decision. This appeal is from a decree in favor of the plaintiff upon all three causes of action asserted in the complaint. The appellants' present attorneys did not participate in the trial proceedings.

According to the Petrus brothers' testimony, they installed the levees and the pump under an oral contract with Dale Wiley, who was the appellee's general manager for 18 years before his death in 1962. The precise terms of the asserted oral agreement are not in the record, because the chancellor sustained the appellee's objection to that testimony. Although the appellants contend that the terms of the contract were admissible, there was no proffer of proof when the appellee's objection was sustained. We are left to assume that the agreement simply authorized the Petruses to enclose and occupy the 20-acre tract and to pump water from the reservoir.

The irrigation company's position all along has been that its manager, Wiley, had neither actual nor

apparent authority to enter into the asserted agreement with the Petrus brothers. Familiar basic rules governing the authority of a corporate manager are discussed by Fletcher in his Cyclopedia of the Law of Private Corporations (1969 rev.). In Section 667 the author states the fundamental principle that such a manager has implied or apparent authority to make contracts "falling within the scope of the ordinary and usual business of the company." Such an agent, however, has no authority to sell the company's real estate, unless specially empowered to do so. § 687. Fletcher adds that it is a well-known rule that the manager of a corporation cannot give away its property. §689.

Applying the foregoing rules to the case at bar, we are of the opinion that the chancellor was right in concluding that Wiley did not have actual or apparent authority to make the asserted contract with the Petruses. Roger Crowe, the president of the corporation, testified that Wiley did not have that authority. The company's first manager, Fricke, and its present manager, Downing, both testified that they would not have executed a contract for a period in excess of a year. There is no contrary testimony with respect to Wiley's actual authority.

With respect to Wiley's apparent authority the record is equally favorable to the appellee. The irrigation company's standard form of contract appears to have been a one-year contract for the sale of water from Peckerwood Lake. Wiley unquestionably had the power to execute those agreements; for, in Fletcher's words, they fell within the ordinary and usual business of the company. There is no proof, however, that Wiley ever entered into a contract remotely similar to that now asserted by the appellants. There was proof that Wiley employed the witness Hahn to clear 100 acres, but such an undertaking would be within the company's ordinary business of impounding water. There was also testimony that Hahn discussed a $15,000 contract with Crowe, who said that Wiley had full authority to enter into it. There is, however, no proof or proffer of proof of the terms of that contract, which may have been a routine one.

It is clear that the agreement now relied upon by the Petruses was not within the ordinary and usual scope

of the irrigation company's business. The Petruses testified that they were to have a perpetual right to occupy the 20-acre enclosure. We infer that they were also to have a perpetual right to pump water from the reservoir. There is no suggestion that the Petruses were to make any monetary payment for those valuable rights. Instead, the company's inducement for making the agreement seems to have been some rather nebulous benefit from the accelerated drainage that would result from the construction of the levees. The appellee's testimony indicates that such an acceleration was not really beneficial and could have been attained by the company itself at an expense of not more than $1,000. It is of course quite obvious that if the irrigation company made a practice of entering extensively into similar agreements by which the bed of its reservoir was released to others in perpetuity, with no financial return to the company, it would eventually be out of business.

We conclude that Wiley had neither actual nor apparent authority to make the contract. We need not discuss at length the appellants' contention that the company ratified the contract by "inaction and silence." Crowe testified that as soon as he noticed the Petruses' enclosure, which was then complete or nearly so, he told them that Wiley did not have the authority to permit the encroachment and that it would have to be removed. The appellee took no affirmative action that could be regarded as a ratification of the agreement. It did fail to bring suit for more than two years, but during that delay there was no disadvantageous change of position on the part of the Petruses. A ratification might be found if it were shown that the irrigation company was knowingly receiving substantial benefits during the period of its inaction, as in *Southern Elec. Corp. v. Ashley-Chicot Elec. Co-op*, 220 Ark. 940, 251 S.W. 2d 813 (1952), but, as we have indicated, the weight of the evidence does not establish the appellee's receipt of such benefits.

Two other points for reversal are argued. First, the chancellor, in addition to ordering the removal of the encroachments, awarded the appellee $4,450 as the fair rental value of the 20 acres during the appellants' oc-

cupancy. The appellants are right in stating that the record contains no evidence fixing the rental value of the land. That part of the decree must be reversed.

Secondly, there is also no proof to support an award of $13,294.98 for the appellants' consumption of water. That award was to be calculated at a specified percentage of the market value of the rice and soy beans grown on the lands that were watered. The market value and sale price of the crops were not proved, but the deficiency cannot be charged to the appellee. At the beginning of the trial the parties stipulated that the market value and sale price would "be submitted by the Defendants and become a part of the record." Had Mr. Reed, the appellants' trial attorney, lived, he would unquestionably have recognized his duty to complete the record. Unfortunately Mr. Reed died, and the appellants' present attorneys, in taking the appeal, simply designated the entire record. In view of that designation there was no reason for the appellee's counsel to be aware of the deficiency until they received a copy of the appellants' printed abstract and brief. Since the omitted proof was not available in the files of the trial court, the appellee could not have had it sent up pursuant to a writ issued by this court. Ark. Stat. Ann. §§ 27-2129.1 and -2129.2 (Repl. 1962). We see no objection to counsel's decision to explain the matter in their brief. In the circumstances justice requires that the cause be remanded so that the missing testimony may be supplied and a supplementary decree be entered.

Affirmed in part, reversed in part, and remanded.

HARRIS, C.J., not participating.